**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH ALVAREZ,**

**Plaintiff,**

**v.**

**PNEUMOABEX, CORP.; EAGLE SIGNAL CONTROLS,**
**INC.; DANAHER CONTROLS CORP.; DANAHER**
**CORPORATION; and BARRON MACHINERY, INC.,**

**Defendants,**

                                                    **5:99-CV-1352**
                                                       **(FJS/GJD)**

**PNEUMOABEX, CORP.,**

**Third-Party Plaintiff,**

**v.**

**ESQUIRE NOVELTY CORPORATION, a division of**
**Strombecker Corporation; and STROMBECKER**
**CORPORATION,**

**Third-Party Defendants.**

_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **FINKKELSTEIN, LEVINE,** | **JOSEPH ALVAREZ, ESQ.** |
| **GITTELSOHN & PARTNERS, LLP** | |
| 436 Robinson Avenue | |
| Newburgh, New York 12550 | |
| Attorneys for Plaintiff | |
| | |
| **FRIEDMAN, HIRSCHEN, MILLER** | **JEFFREY N. MILLER, ESQ.** |
| **& CAMPITO, P.C.** | **JOHN L. ORFAN, ESQ.** |
| 131 State Street | |
| Schenectady, New York 12301 | |
| Attorneys for Defendant/Third-Party | |
| Plaintiff Pneumoabex, Corp. | |

**MESIROV GELMAN JAFFE CRAMER**      **ANTHONY J. WATKINS, ESQ.**
**& JAMIESON**
Mellon Bank Center, 38th Floor
1735 Market Street
Philadelphia, Pennsylvania 19103
Attorneys for Defendant/Third-Party
Plaintiff Pneumoabex, Corp.

**FIX, SPINDELMAN, BROVITZ**      **KENNETH M. ALWEIS, ESQ.**
**& GOLDMAN, P.C.**
441 South Salina Street
Suite 604
Syracuse, New York 13201
Attorneys for Defendants Eagle Signal
Controls, Inc; Danaher Controls Corp;
and Danaher Corporation

**THUILLEZ, FORD, GOLD, JOHNSON**      **JOHN T. MALONEY, ESQ.**
**& BUTLER, LLP**
20 Corporate Woods Boulevard
6th Floor
Albany, New York 12211
Attorneys for Third-Party Defendants
Esquire Novelty Corporation and Strombecker
Corporation


**SCULLIN, Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff's amended complaint asserts causes of action against Defendants for negligence, strict liability design defect, and strict liability manufacturing defect.[1]  It also asserts a cause of

---

[1] Plaintiff has subsequently withdrawn his manufacturing defect claims against Defendants Eagle Signal Controls, Inc.; Danaher Controls Corp.; and Danaher Corporation (collectively "Eagle Signal").  *See* Dkt. No. 114 at Pt. 1 at 24.  Accordingly, the Court grants Defendant Eagle Signal's motions for summary judgment with respect to these claims.

action against Defendants, other than Defendant Barron Machinery, Inc. ("Barron"),[2] for breach of implied warranty of merchantability and breach of express warranty.[3,4]

Defendant Eagle Signal asserts causes of action for contribution against Defendants Pneumoabex, Corp. ("Pneumoabex") and Barron and against Third-Party Defendants.

Defendant Pneumoabex asserts causes of action for contribution and indemnification against Defendants Eagle Signal and Barron and against Third-Party Defendant Strombecker Corporation ("Strombecker").

Third-Party Defendant Strombecker asserts causes of action for contribution and indemnification against Defendants.

Third-Party Defendant Esquire Novelty Corporation ("Esquire") asserts causes of action for contribution and indemnification against Defendant Pneumoabex.

Currently before the Court are (1) Defendant Eagle Signal's motion to exclude Plaintiff's expert, Igor Paul, from testifying as an expert; (2) Defendant Eagle Signal's motion for summary judgment with respect to all claims and cross-claims asserted against it; (3) Defendant Eagle Signal's motion to dismiss Plaintiff's claims and Third-Party Defendants' cross-claims against it due to their spoliation of material evidence; and (4) Defendant Pneumoabex's motion for

---

[2] Although Defendant Barron has been served with process, *see* Dkt. No. 36, it has not appeared in this action.

[3] Plaintiff has subsequently agreed not to assert an express warranty claim against Defendant Eagle Signal.  *See* Dkt. No. 114 at Pt. 1 at 24.  Accordingly, the Court grants Defendant Eagle Signal's motion for summary judgment with respect to Plaintiff's express warranty claims.

[4] Although Plaintiff's motion papers indicate his belief that he has also asserted a failure to warn claim, no such claim appears in his amended complaint.  *See* Dkt. No. 28.

summary judgment with respect to all claims and cross-claims asserted against it.

## II. BACKGROUND

The following facts are not in dispute.  Plaintiff was injured on April 22, 1999, while operating a trim press that his employer, Third-Party Defendant Esquire, owned at its plant in Amsterdam, New York.  He was using the press to form toy gun parts.  On the day of the accident, Plaintiff pressed the two buttons on the press required to operate it.  The press completed a cycle.  Plaintiff reached into the press with his left hand to withdraw the finished product.  As he did so, he looked away from the press and then felt the press cycle and crush his hand.

Defendant Pneumoabex's predecessor-in-interest Dennison had manufactured the trim press in 1963.  As originally designed, the press had a manual control system that was operated using two hand levers located on either side of the press.  The press was designed to operate when both levers were simultaneously depressed and stop when either or both levers were released.[5]

The record contains no information as to the ownership of the press between 1963 and 1980.  In 1980, Defendant Barron sold the press to Third-Party Defendant Strombecker. Sometime between 1963 and 1980, the original manual control system had been removed and replaced with an electrical control system consisting of push buttons, electronic control circuitry, and a solenoid-equipped control valve.  The electrical control system required the operator to

---

[5] Although Plaintiff denies this statement, he does so without citation to the record.  *See* Dkt. No. 111 at ¶ 2.  Therefore, the Court deems Plaintiff to have admitted this statement.  *See* L.R. 7.1(a)(3).

press two palm buttons located on the front of the press.  The press was designed to cycle only when both palm buttons were pressed.  Part of the electrical control system was a controller that Defendant Eagle Signal manufactured.

## III. DISCUSSION

A.      **Defendant Eagle Signal's motion to preclude Plaintiff's Expert, Igor Paul, from testifying as an expert**

In order for expert testimony to be admissible, the testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods. . . ."  Fed. R. Evid. 702.  Furthermore, the expert witness must have "applied the principles and methods reliably to the facts of the case."  *Id.*  Among the factors that a court may consider in assessing the admissibility of expert testimony are

> —Whether a "theory or technique . . . can be (and has been) tested";
> —Whether it "has been subjected to peer review and publication";
> —Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
> —Whether the theory or technique enjoys "'general acceptance'" within a "'relevant scientific community.'"  [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,] 509 U.S. [579,] 592-594, 113 S. Ct. 2786.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999).  However, these factors "do *not* constitute a 'definitive checklist or test.'"  *Id.* at 150 (quotation omitted).  Therefore, a court's "gatekeeping inquiry [in determining whether to admit expert testimony] must be "'tied to the facts'" of a particular 'case.'"  *Id.* (quotation omitted).

In the instant case, Dr. Paul possesses B.S., M.S, and Sc.D. degrees in Mechanical Engineering from the Massachusetts Institute of Technology ("MIT").  *See* Dkt. No. 109 at Pt. 4

at Exhibit "A." He was a faculty member within the MIT Mechanical Engineering Department

from 1964 to 2003. *See id.* He has participated in the design, evaluation, and/or testing of more

than four dozen electronic and electro-magnetic control systems for various industrial machines,

including all types of presses. *See* Dkt. No. 109 at Pt. 3 at ¶ 2. He has personally produced at

least three dozen intentional relay, contactor coil, and contact failures and has measured the

resulting behavior and damage. *See id.* Dr. Paul appears to be generally qualified to render

opinions with respect to the operation of controllers as parts of industrial presses.

The more difficult question, however, is whether Dr. Paul's opinions in this particular

case are reliable. His general opinion, as stated in his Rule 26 expert report, is that

> Mr. Alvarez's accident occurred on April 22, 1999 as he was using the
> hydraulic press to trim cast parts at his place of employment at Esquire
> Novelty Co. The press recycled un-expectedly while he was reaching into
> the press, crushing his left wrist. After the accident, it was found that the
> output relay contacts in the Eagle Signal Control CES-227 "Machine
> Safety Control Module" had fused, causing the malfunction and the
> unexpected closing of the press on Mr. Alvarez's hand.

*See* Dkt. No. 109 at Pt. 4 at Exhibit "B" at 1. Although Dr. Paul's expert report contains no

support for his "it was found" statement, such support does appear in his subsequent affidavit.[6]

---

[6] Defendant Eagle Signal argues that Dr. Paul's affidavit is not admissible because it
expresses opinions that were not contained in his report. Defendant Eagle Signal is effectively
asking the Court to exclude Dr. Paul's affidavit pursuant to Rule 37(c)(1) of the Federal Rules of
Civil Procedure because Plaintiff failed to comply with the requirements for an expert report that
Rule 26(a)(2)(B) provides. "[C]ourts in this Circuit have considered imposition of sanctions
under Rule 37 a 'drastic remedy' that should only be applied 'in those rare cases where a party's
conduct represents flagrant bad faith and callous disregard' of the Federal Rules." *Commercial
Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 62 (S.D.N.Y. 2003) (quoting
*Sterling v. Interlake Industries., Inc.*, 154 F.R.D. 579, 587 (E.D.N.Y. 1994)) (other citation
omitted); *see McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995)
(citation omitted); *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (citations omitted).

(continued...)

In that affidavit, he states that

> [w]hen I visually inspected the controller and tested the continuity of the
> controller output contacts on June 9, 1999, the controller had already been
> removed from the rest of the press.  My testing of the output contacts
> ascertained that the controller itself was continuing to malfunction (after
> having been removed from the rest of the press).  I determined with
> ENGINEERING CERTAINTY that that particular Eagle Signal Controls
> "CES-227 Machine Safety Control Module" had failed in an "unsafe"
> manner, i.e. by sending a signal to the rest of the electromagnetic ram
> controls for the process to close when it should not have done so.

See Dkt. No. 109 at Pt. 3 at ¶ 19.  He also states that, subsequent to his June 9, 1999 inspection

of the controller, he "reviewed the Defendants' experts' disclosures and depositions and

participated in the disassembly and inspection of the failed Eagle Signal Control's CES-227

'Machine Safety Module.'"  See id. at ¶ 4.  He further states that

> [a]fter documenting the details of the electrical components, wiring and

---

[6](...continued)
Dr. Paul's Rule 26 report, excluding biographical information, is two and one-half pages
long.  It provides no description of the mechanism that led to the controller's alleged failure.
Although it states that the output relay contacts in the controller "fused" and became "welded,"
he apparently meant to say that "they had stuck."  See Deposition of Igor L. Paul, taken July 15,
2005, Dkt. No. 96 at Pts. 15-16 ("Paul Dep."), at 86:19-87:20.  Although at the time Dr. Paul
wrote the report he had not yet disassembled the controller, he now seeks to testify to what he
found when he did disassemble it.  Although the report states that he reviewed the "[a]pplicable
standards," it does not indicate what those standards are.  See Dkt. No. 109 at Pt. 4 at 6.
However, now he seeks to testify with respect to the applicable ANSI standards.  Finally, the
report gives no indication of whether Dr. Paul had designed feasible alternative controllers or
whether he was aware of feasible alternatives that were available in the marketplace.

Although Dr. Paul's Rule 26 report is inadequate in several respects, and his delay in
supplementing the report is considerable, there is no evidence that either the inadequacy or the
delay was intentional or indicative of bad faith.  Furthermore, since his report covers much of his
current testimony in summary fashion, Defendants and Third-Party Defendants have not suffered
surprise.  Accordingly, the Court finds that preclusion of Dr. Paul's affidavit is too severe a
sanction.  However, if either Defendants and/or Third-Party Defendants desire to conduct further
discovery in light of Dr. Paul's newly developed opinions, the Court grants them leave to move
for such discovery.

the hydraulic drive components by photos, notes, and video tape, I was also able to test the trim press operation with a functional CES-227 control module substituted for the failed unit and with ALL other electrical and hydraulic components in the same condition as they were after the accident . . . .

22)     I was very familiar with the possible failure modes of all other electrical, electromechanical and hydraulic components (including the contactors and solenoid controlled hydraulic drive) on the press and was able to eliminate each one of them as potential contributing causes of the accident by logical exclusion based on my knowledge and experience of how trim press ram motion was actuated and controlled, how it would be affected before, during and after the accident . . . . I did not need to individually and functionally test them to reach that conclusion with a high degree of engineering certainty.

*See id.* at ¶¶ 21-22.  Finally, Dr. Paul states that

[m]y examination of the inside of the Eagle Signal Controls "CES-227 Machine Safety Control Module" and, eventually, the inside of the relay and the controller output relay contacts, confirmed that, the controller had malfunctioned and failed in an "unsafe" manner because of the failure of a single controller component, i.e. [sic] the relay in the control unit.  This failure, however it was caused, had sent the erroneous signal to the hydraulic power unit to double cycle the press and was a proximate cause of the accident.  This was determined by me with a reasonable degree of engineering certainty.

30)     The failure of the relay to immediately open the relay contacts after the last normal cycle before the accident, was due to "sticking" of the contacts caused by microscopic welding or fusion of the contacts.  This is the most common, expected, well-known and well-documented failure mode of relay contacts and, regardless of what caused it, it had definitely occurred in this controller.

*See id.* at ¶¶ 29-30.[7]  These statements appear to present an adequate foundation for Dr. Paul's

opinion that the failure of the controller caused Plaintiff's accident.

---

[7] Dr. Paul's affidavit appears to contradict portions of his deposition testimony.  *See* Paul Dep. at 57:5-6, 59:21-60:17, 61:4-7.  If either Defendants and/or Third-Party Defendants desire to conduct further discovery in light of these apparent contradictions, the Court grants them leave to move for such discovery to explore these issues.

Defendant Eagle Signal points to several other facts that it believes show that Dr. Paul is not qualified to testify as an expert.  Namely, his examination of the press and the controller lasted a total of twenty to thirty minutes.  *See* Dkt. No. 94 at Pt. 32 at ¶ 35.  The only testing that he conducted of the electrical components was to attach his ohmmeter to the controller.  *See id.* at ¶ 36.[8]  He did no other testing of the press or its components.  *See id.*  He did not prepare, or do a cost-analysis for, an alternative design for the controller.  *See id.* at ¶ 37.  "He did not have his theories as to the cause of accident reviewed by any of his peers.  He did not obtain an exemplar controller and never identified any similar controllers that were on the market for comparison."  *See id.*  In forming his opinion, he neither used an identified technique nor determined an error rate for his method.  *See id.*

Although these facts may provide bases for Defendant Eagle Signal to question the strength of Dr. Paul's opinions or the relevancy of his opinions to particular issues, they do not themselves show that Dr. Paul's opinions are inadmissible as unreliable.  As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).  Accordingly, because Dr. Paul has presented sufficient evidence as to his qualifications and the bases of his opinions, the Court denies Defendant Eagle Signal's motion to preclude Dr. Paul from offering expert testimony.

---

[8] Although Plaintiff's Response to Defendant Eagle Signal's Statement of Material Facts denies this statement and those that follow in this paragraph, Plaintiff has cited nothing in the record that supports his denials.  *See* Dkt. No. 112 at ¶ 4.  Therefore, the Court deems Plaintiff to have admitted these statements.  *See* L.R. 7.1(a)(3).

**B.**      **Defendant Eagle Signal's motion for summary judgment**

       *1. Standard of review*

       A court may grant summary judgment when the moving party carries its burden of showing the absence of a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c). In making this determination, the court must resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). If the moving party has met its burden, the nonmoving party may not rely upon his pleadings but must come forward with specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

       *2. Negligence & strict liability design defect*

       Defendant Eagle Signal contends that it is entitled to summary judgment on Plaintiff's negligence and strict liability design defect claims because Plaintiff's expert has presented no theory as to the cause of the press' spontaneous cycling and has not identified an alternative feasible design. Dr. Paul's expert report appears to present, albeit imprecisely, a theory of the cause of the press' spontaneous cycling. Dr. Paul's report states that "[t]his means that at some point, the control module **would unexpectedly fail** and if the failure occurred by welded output relay contacts (as it did on this control module), then the press on which it was being used would unexpectedly close . . . ." *See* Dkt. No. 109 at Pt. 4 at Exhibit "B" at 3. This statement is sufficient to indicate that Plaintiff's injury occurred because contact relays within the controller remained in electrical continuity after the time that the circuit through them should have been broken.

Plaintiff's proof of an alternative feasible design is more problematic.  To establish a

*prima facie* case for strict liability design defect or negligence, a plaintiff must "present evidence

that the product, as designed, was not reasonably safe because there was a substantial likelihood

of harm and it was feasible to design the product in a safer manner." *Voss v. Black & Decker*

*Mfg. Co.*, 59 N.Y.2d 102, 108 (1983) (strict liability design defect); *see Lancaster Silo & Block*

*Co. v. Northern Propane Gas Co.*, 75 A.D.2d 55, 62 (4th Dep't 1980) ("[I]n a design defect case

there is almost no difference between a prima facie case in negligence and one in strict liability .

. . ." (internal citations omitted)).  "A plaintiff can satisfy this burden in two ways: (1) plaintiff's

expert can demonstrate, through testing and construction of a prototype, that such an alternative

is feasible, practical, economical and safe; and/or (2) plaintiff's expert can identify

manufacturers of similar equipment that have put the proposed design into use." *Toole v. Toshin*

*Co, Ltd.*, No. 00-CV-821S, 2004 WL 2202580, *3 (W.D.N.Y. Sept. 29, 2004) (citing [*Rypkema*

*v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003)]).  "Where a plaintiff's expert

proposes testimony concerning alternative designs that are never put into application by the

expert or any identified competitive manufacturer, the trial court is justified in excluding that

expert's testimony." *Id.* (citations omitted).

In his expert report, Dr. Paul stated that

> [t]he CES-227 control module should either have incorporated a self-
> checking series connected dual disconnect output **SAFETY** circuit . . . , or
> it should be specified **ONLY** for use with presses with independent and
> positive point-of-operation guarding which would protect the operator
> when the **UNSAFE** failure of the module occurred.

*See* Dkt. No. 109 at Pt. 4 at Exhibit "B" at 3.  Dr. Paul's statement does not identify either an

alternative feasible design that he has developed or an alternative feasible design that is

commercially available.  In his more recent affidavit, however, Dr. Paul does, at least loosely,

identify a commercially feasible alternative design:

> I did not personally propose and/or develop and/or test self-checking, "fail-
> safe" anti-repeat control circuits, but they have been developed by the
> machine controls industry over the past 25 to 30 years.  Controllers using
> this technology have been commonly and commercially available for at
> least 15 years, and, [sic] can be purchased now from companies like
> Rockford Systems Inc.  This technology has been extensively published
> (not by me), peer reviewed, tested and is included in ANSI and OSHA
> standard for machine control systems (like ANSI B11.2-1995).

*See* Dkt. No. 109 at Pt. 3 at ¶36.  Although this identification of an alternative feasible design

would likely not be sufficient to prove negligence or strict liability design defect were this case

to go to trial, the Court finds that it is sufficient to raise a genuine issue with respect to whether

there is an alternative feasible design.

Accordingly, the Court denies Defendant Eagle Signal's motion for summary judgment

with respect to Plaintiff's negligence and strict liability design defect claims.

### 3. Implied warranty of merchantability

Although Defendant Eagle Signal's motion seeks the dismissal of Plaintiff's breach of

warranty claims, the discussion in its memorandum of law is limited to Plaintiff's express

warranty claims.  *See* Dkt. No. 94 at Pt. 33 at 15-16.  Accordingly, since Defendant Eagle Signal

has not shown the absence of a genuine issue with respect to Plaintiff breach of implied warranty

of merchantability claims, the Court denies its motion for summary judgment with respect to

those claims.

**C.    Defendant Eagle Signal's motion to dismiss Plaintiff's complaint and Third-Party Defendant Strombecker's cross-claims against it because of spoliation**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). If a court finds that a party has engaged in spoliation, it may impose a sanction that serves "the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* (citation omitted). Dismissal of the action may be "appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *Id.* (citation omitted).

Defendant Eagle Signal's expert speculates that other components of the electrical control system may have been responsible for the press' spontaneous cycling but states that he cannot determine the cause with certainty because of the removal of the system. *See* Dkt. No. 94 at Pt. 33 at 17. However, Plaintiff's expert, Dr. Paul, states that he

> specifically, with complete engineering certainty, eliminated a short-circuited contactor and/or "shorted wires in that area" as potential cause(s) because such failures could not possibly, under any known scientific, electrical or mechanical principles, produce the repeated signal reversals to the hydraulic valve which were required to produce the uncontested sequence of ram motions which occurred at the time of the accident and during subsequent testing.

> * * *

> 25)    In fact, when the faulty controller was replaced in the accident press after the accident, the press operated properly, confirming with reasonable scientific certainty that it was the controller which had malfunctioned at the time of the accident and not any of the downstream electrical, electro-mechanical and/or hydraulic component(s).

*See* Dkt. No. 109 at Pt. 3 at ¶¶ 23, 25. From what the Court understands about the events that led

to Plaintiff's accident, Dr. Paul's analysis seems correct.  Even if other parts of the electrical control system were destroyed, there does not appear to be any scientific basis for believing that they might have been the cause of the accident.  It would be analogous to blaming a car's battery or spark plug wire for its engine's failure to stop when the key was turned to the off position. Since it appears that Dr. Paul can testify to the fact that the removal of the press' electrical control system has not prejudiced Defendant Eagle Signal, the Court denies Defendant Eagle Signal's motion to dismiss Plaintiff's compliant and Third-Party Defendant Strombecker's cross-claims against it because of spoliation.

**D.      Defendant Pneumoabex's motion for summary judgment**

Defendant Pneumoabex argues that it cannot be liable due to a subsequent modification of the press.

> The law is clear that "a manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of the plaintiff's injuries" (*Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 475, 426 N.Y.S.2d 717, 403 N.E.2d 440).

*Fernandez v. Mark Andy, Inc.*, 7 A.D.3d 484, 485 (2d Dep't 2004).  Although it does not appear that the New York Court of Appeals has expressly extended the subsequent modification rule to breach of warranties claims, the statement of and rationale for the rule suggest that that court would apply the rule equally to such claims.[9]

---

    [9] Indeed, some New York courts have stated the subsequent modification rule more broadly.  *See Starobin v. Niagara Mach. & Tool Works Corp.*, 172 A.D.2d 64, 66 (3d Dep't 1991) ("It is fundamental that a defendant cannot be held liable for a subsequent modification

(continued...)

-14-

Plaintiff relies upon the opinions of its expert, Dr. Paul, for his contention that Defendant Pneumoabex is liable for designing a defective product despite the press' subsequent modification. Dr. Paul states that Plaintiff's accident would have been prevented if Defendant Pneumoabex had provided point-of-operation guarding. *See* Paul Aff. at Exhibit "B" at 2. What Dr. Paul does not state is that the accidental cycling of the press and the consequent injury of an unguarded operator were reasonably foreseeable with the press' original manual operating system. Instead, Dr. Paul notes that, in 1963, Dennison was also manufacturing presses with electrical operating systems similar to the one that was on the press at the time of Plaintiff's injury. However, this fact would only potentially be significant if the alteration from a manual to an electrical control system was relatively simple and, thus, reasonably foreseeable. Dr. Paul does not address the nature of such an alteration. Therefore, Plaintiff has failed to show that the press was defective at the time it left Dennison's control.

Accordingly, the Court grants Defendant Pneumoabex's motion for summary judgment with respect to all of Plaintiff's claims. Also, since there is no genuine issue with respect to whether Defendant Pneumoabex is partly or wholly responsible for Plaintiff's injuries, the Court grants Defendant Pneumoabex's motion for summary judgment with respect to all cross-claims asserted against it. Furthermore, since the cross-claims that Defendant Pneumoabex asserted are only for contribution and indemnification, the Court also grants Defendant Eagle Signal's motion

---

[9](...continued)
which substantially alters a product and is the proximate cause of a plaintiff's injury . . . ." (internal citation omitted)); *Green v. Kautex Machs., Inc.*, 159 A.D.2d 945, 946 (4th Dep't 1990) ("A manufacturer of a product will not be cast in damages . . . where, 'after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries' . . . ." (internal quotation omitted)).

for summary judgment with respect to the cross-claims that Defendant Pneumoabex asserted against it and *sua sponte* grants Defendant Barron and Third-Party Defendant Strombecker summary judgment with respect to the cross-claims that Defendant Pneumoabex asserted against them.  Finally, since the only cause of action remaining against Third-Party Defendant Strombecker is Defendant Eagle Signal's cross-claim for contribution, the Court *sua sponte* grants Defendants Eagle Signal and Barron summary judgment with respect to Third-Party Defendant Strombecker's cross-claims against them.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendant Eagle Signal's motion to preclude Dr. Paul from testifying as an expert is **DENIED**; and the Court further

**ORDERS** that, if either Defendants or Third-Party Defendants desire to conduct further discovery in light of Dr. Paul's newly developed opinions, they must file such a motion within **thirty (30)** days of the date of this Order; and the Court further

**ORDERS** that Defendant Eagle Signal's motion for summary judgment is **DENIED** with respect to Plaintiff's negligence, strict liability design defect, and implied warranty of merchantability claims and **GRANTED** with respect to his strict liability manufacturing defect and express warranty claims; and the Court further

**ORDERS** that Defendant Eagle Signal's motion to dismiss Plaintiff's complaint and Third-Party Defendant Strombecker's cross-claims against it because of spoliation is **DENIED**;

-16-

and the Court further

ORDERS that Defendant Pneumoabex's motion for summary judgment is **GRANTED** with respect to all of Plaintiff's claims and with respect to Defendant Eagle Signal's and Third-Party Defendants Strombecker's and Esquire's cross-claims against it; and the Court further

ORDERS that Defendant Eagle Signal's motion for summary judgment is **GRANTED** with respect Defendant Pneumoabex's cross-claims against it; and the Court further

ORDERS that Defendant Barron and Third-Party Defendant Strombecker are *sua sponte* **GRANTED** summary judgment with respect to Defendant Pneumoabex's cross-claims against them; and the Court further

ORDERS that Defendant Eagle Signal is *sua sponte* **GRANTED** summary judgment with respect to Third-Party Defendant Strombecker's cross-claims against it;[10] and the Court further

ORDERS that, if neither Defendants nor Third-Party Defendants move for further discovery, Plaintiff's counsel shall initiate a telephone conference through a professional

---

[10] Since the only cause of action remaining against Third-Party Defendant Strombecker is Defendant Eagle Signal's cross-claim for contribution, Third-Party Defendant Strombecker may not maintain its cross-claim for contribution against Defendant Eagle Signal.

conference operator with the Court and all other counsel on **September 20, 2005**, at **9:00 a.m.**, to set a trial date for this action.[11]

**IT IS SO ORDERED**.

Dated: August 22, 2005
       Syracuse, New York

                                    Frederick J. Scullin, Jr.
                                    Chief United States District Court Judge

---

[11] Remaining in this action are (1) Plaintiff's negligence, strict liability design defect, and implied warranty of merchantability claims against Defendants Eagle Signal Controls, Inc., Danaher Controls Corp., and Danaher Corporation; (2) Plaintiff's negligence, strict liability design defect, and strict liability manufacturing defect claims against Defendant Barron; (3) Defendants Eagle Signal Controls Inc.'s, Danaher Control Corp.'s, and Danaher Corporation's cross-claims for contribution against Defendant Barron and Third-Party Defendants; and (4) Third-Party Defendant Strombecker's cross-claims for contribution and indemnification against Defendant Barron.